UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MISTIE MORALES and | ) | |
| WENDY WALTERS, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-1124-RLY-TAB |
| | ) | |
| GEO GROUP, INC., and INDIANA | ) | |
| DEPARTMENT OF CORRECTIONS, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On August 20, 2008, Plaintiff, Wendy Walters ("Plaintiff"), filed her Complaint

against the Geo Group, Inc. ("GEO") and the Indiana Department of Corrections

("IDOC") (collectively "Defendants"), alleging sexual harassment, retaliation, and

constructive discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e

*et seq*.  For the reasons set forth below, the court **GRANTS** in part, and **DENIES** in part

Defendants' motion.

I.     **Facts**

       A.     **Background**

1.     GEO is engaged in the business of privatized correctional management and

       medical and mental health rehabilitation services.  (Affidavit of Jeffrey Wrigley

       ("Wrigley Aff.") ¶ 4).

2.     The New Castle Correctional Facility ("NCCF"), located in New Castle, Indiana,

1

is a minimal and maximum security prison, housing security levels 1 through 3 adult male offenders.  (*Id.* ¶ 5).

3.   In 2007, GEO provided secure care, custody, and control for Indiana and Arizona Department of Correction offenders at NCCF.  (*Id.*).

4.   On March 15, 2007, GEO offered Plaintiff a position as Case Manager in NCCF, and she began her employment there on March 26, 2007.  (*Id.* ¶ 7).

5.   At the beginning of her employment, Plaintiff signed an Acknowledgment confirming that she received, read, and understood GEO's policies, including the Sexual Harassment/Workplace Harassment, Equal Employment Opportunity, and the Standards of Employee Conduct, Policy 3.2.2.  (*Id.* ¶ 7; *Id.*, Ex. A at 32-33, 37).

6.   GEO's policy defines sexual harassment as "[m]aking unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature a condition of employment"; "[m]aking submission to or rejection of such conduct the basis for employment decisions affecting the employee; or"; "[c]reating an intimidating, hostile or offensive working environment by such conduct."  (*Id.*, Ex. A at 421).

7.   GEO directs employees who believe they are the victims of sexual harassment to "immediately contact their supervisor, management, Corporate Human Resources or the Hotline, which is an independent, professional service" available "24 hours per day, 7 days per week."  (*Id.*, Ex. A at 421).

2

8.      Plaintiff also acknowledged receipt of the IDOC's Information and Standards of

Conduct, the Code of Ethics for the Conduct of State Business, and Adult

Disciplinary Procedures Policy.  (*Id.*, Ex. A at 37-38).

**B.      Plaintiff's Job Duties**

9.      Plaintiffs' primary duties as Case Manager were to "provide[] counseling services:

and "assist[] the inmates/detainees in adjusting to facility life and obtaining needed

services or changes in assignment."  (*Id.* ¶ 8).

10.     In her position, Plaintiff interacted daily and personally with offenders.  (*Id.*).

11.     Plaintiff underwent several weeks of training with both IDOC and GEO employees

before beginning her assigned duties.  (*Id.* ¶ 9).

12.     During Plaintiff's job training, Plaintiff was assigned to Unit Team Manager Bart

Sorrell ("UM Sorrell").  (Affidavit of Wendy Walters ("Plaintiff Aff.") ¶ 4).

13.     Unit Team Managers are first level supervisors who report to the Assistant

Superintendent of Programs.  (*Id.*).  Unit Team Managers have no hiring or firing

authority, and may discipline Case Managers only with the approval of one of the

Assistant Superintendents.  (*Id.*).

14.     Plaintiff was assigned to work with Arizona offenders.  (*Id.*).

**C.      Plaintiff's Initial Complaints**

15.     On the first day of Plaintiff's job training, UM Sorrell made comments to Plaintiff

about her breast size.  (*Id.* ¶ 5).

16.     That same day, UM Sorrell introduced Plaintiff to Unit Team Manager Dallis

Sloss ("UM Sloss").  During their conversation, UM Sloss commented that he and a male friend would like to have three-way sex with her.  (*Id*.).  Plaintiff was shocked and rejected the request.  (*Id*.; Wrigley Aff., Ex. M at 3).

17.   Plaintiff reported the comment to UM Sorrell, who replied, "Do you blame him?" (Plaintiff Aff. ¶ 8; Wrigley Aff., Ex. M at 4).  UM Sorrell did not report the incident.  (Wrigley Aff., Ex. M at 3, 8).

18.   A few days after UM Sloss made a request for three-way sex, UM Sloss became her immediate supervisor.  (Plaintiff Aff. ¶ 10).

19.   UM Sloss continued to make inappropriate comments to Plaintiff on a daily basis, commenting on her breasts, how she looked, and how inmates thought she looked. (*Id*.).

20.   Plaintiff complained to Marjorie Gaither, NCCF's Human Resources Manager ("Gaither").  (*Id*. ¶ 11).  Plaintiff wrote an incident report detailing what was said, and gave the report to Gaither.  To Plaintiff's knowledge, no action was taken. (*Id*.; Wrigley Aff., Ex. M at 4).

21.   In May 2007, UM Sloss told Plaintiff to come into his office, where three inmates were present.  (Plaintiff Aff. ¶ 12).  Upon entering his office, the inmates asked her sexually graphic questions such as "did she take it up the ass?" and "did she have a hairy pussy?"  (*Id*. ¶ 13).

22.   Plaintiff reported the incident to UM Sorrell, who told her to report the incident to Gaither.  (*Id*. ¶ 15).  Gaither told Plaintiff to fill out an incident report, detailing

4

what was said and by whom.  (*Id.*).  Again, to Plaintiff's knowledge, no action was taken.  (*Id.*).

23.    Despite Plaintiff's complaints, several IDOC officers also made inappropriate requests to Plaintiff to engage in sexual relations, which she rejected.  (*Id.* ¶ 16; *see also id.* ¶¶ 17-18).  For example, in May or June 2007, Officer Mark Yanez ("Officer Yanez") asked Plaintiff two or three times if he could perform oral sex on her.  (*Id.* ¶ 17).  Officer Patrick Parker ("Officer Parker") asked Plaintiff if she would have sex with him and his wife.  (*Id.* ¶ 18).

24.    Plaintiff also alleges that Officer Jason Upchurch ("Officer Upchurch"), who monitored the NCCF's security gates, made Plaintiff wait long periods of time before unlocking a particular gate for her, while allowing the male employees or inmates to enter through other gates.  (*Id.* ¶ 19).

### D.    Plaintiff's June Meeting with Gaither

25.    On June 28, 2007, Plaintiff met with Gaither to discuss concerns she was having with one of the facility's captains.  (Wrigley Aff. ¶ 10; Wrigley Aff., Ex. C).  During the meeting, Plaintiff discussed several issues, including: (1) comments from other employees regarding the way she dressed; (2) her displeasure at being told by some offenders that she should hire a non African-American offender to work for her after her former African-American employee was fired for theft; and (3) comments about her having a relationship with or being too close to offenders.  (*Id.*, Ex. C).  Plaintiff indicated to Gaither that she did not want to file a complaint,

5

but wanted only to alert someone to these events.  (*Id.*).

**E.    Plaintiff Meets with Internal Affairs Investigator Friend**

26.    Around this same time period, Plaintiff went to see (co-plaintiff) Mistie Morales

("Morales"), the Programs Director, to report what had been happening to her.

(Plaintiff Aff. ¶ 20).  Morales told Plaintiff to see Pat Walker ("Assistant

Superintendent Walker"), the Assistant Superintendent.  (*Id.*).

27.    Assistant Superintendent Walker told Plaintiff to see Teresa Friend ("Friend"),

NCCF's Internal Affairs investigator.  (*Id.*).

28.    On July 10, 2007, Plaintiff had a meeting with Friend.  (Affidavit of Brian

Patterson ("Patterson Aff.") ¶ 5).  During Friend's interview, Plaintiff made the

following allegations:

(a)    Captain Theodore Cabral ("Captain Cabral") "yelled and cursed at her" for

delaying the morning offender count by having an offender in her office.

(*Id.* ¶ 5, Ex. A at 495).

(b)    Plaintiff's supervisor, UM Sloss, was sexually harassing her by staring at

her breasts, asking her to engage in a three-way sex act, calling her into his

office so that an offender could ask her her preference of sexual positions,

and by encouraging offenders to made sexually graphic telephone calls to

her.  (*Id.*).

(c)    She and Captain Cabral argued, in front of offenders, over his destruction of

offenders' property.  (*Id.*).

(d)      Officers were making complaints about her appearance.  (*Id*.).

(e)      Another employee "harassed" her by repeatedly asking her out on a date.
The employee eventually stopped asking Plaintiff out on a date after
Plaintiff informed him that she dated only tall men.  (Patterson Aff. ¶ 5, Ex.
A at 539).

29.    On July 11, 2007, Friend interviewed UM Sloss about Plaintiff's allegations.
(Patterson Aff. ¶ 8, Ex. B).  He denied each and every allegation Plaintiff made
against him.  (*Id*.).  Friend also interviewed Unit Team Manager Dan Leflore
("UM Leflore"), whom Plaintiff alleged witnessed UM Sloss staring at Plaintiff's
breasts.  UM LeFlore stated that he did not see, nor have any knowledge of, UM
Sloss sexually harassing Plaintiff.  (*Id*. ¶ 9, Ex. C).  UM Leflore provided Friend
with incident reports about Plaintiff attempting to have improper contact with an
offender, whom UM Leflore removed from her unit.  (*Id*. ¶ 10, Ex. A at 495).  UM
Leflore advised Plaintiff that it was improper to meet an offender in segregation.
(*Id*.).  In addition, Friend interviewed Officer Upchurch regarding Plaintiff's
allegation that he made her wait for a long time before allowing her through a
security gate.  He denied making anyone wait for extended periods at security
gates.  (*Id*. ¶ 11, Ex. D).

30.    Friend's investigative report also contained a record of her interview with Captain
Cabral.  (*Id*., Ex. A at 495).  Captain Cabral recounted the incident in which
Plaintiff delayed the offender head count, and said that he informed Plaintiff of the

importance of having all offenders in their housing units during the formal

morning count.  Plaintiff saluted Captain Cabral, and responded, "yes, sir."  (*Id*.).

### F.    Additional Incidents

31.    In late July 2007, UM Sorrell walked passed Plaintiff and ran his hand between her

legs.  (Plaintiff Aff. ¶ 24).

32.    Plaintiff reported this incident to Friend.  Friend told Plaintiff to write an incident

report, which she did.  To Plaintiff's knowledge, no action was taken.  (*Id*.).

33.    After receiving Friend's investigative reports from the July interviews, the former

Superintendent, Craig Hanks ("Superintendent Hanks"), decided to replace UM

Sloss, Plaintiff's Unit Team Manager, with UM Leflore, against whom Plaintiff

had made no allegations.  (*Id*. ¶ 17; Plaintiff Aff. ¶ 23).

34.    Plaintiff alleges that after she made a complaint to Friend and UM LeFlore became

her supervisor, she began to be treated differently.  (Plaintiff Aff. ¶ 25).  For

example, UM LeFlore told Plaintiff that she could only use one inmate clerk,

rather than the two or three inmate clerks that are typically assigned to a Case

Manager.  By August, she was told she could not use even one inmate clerk.  (*Id*. ¶

26).  In addition, Plaintiff was shunned by co-workers.  (*Id*. ¶ 27).

35.    On August 22, 2007, Bertrina Randall ("Randall"), an Executive Assistant, and

Friend spoke to Plaintiff about her work attire.  (Patterson Aff. ¶ 14; Patterson

Aff., Ex. A at 496).  They believed that her tops were too tight, and that her nipples

were showing through her blouse.  (*Id*; Plaintiff Aff. ¶ 28).  Randall told her to

take off her jacket, which caused Plaintiff humiliation.  This occurred three times. (Plaintiff Aff. ¶ 28-29; Patterson Aff., Ex. G at 141-42).

36.   Randall and Friend completed reports about the incident.  (Patterson Aff., Ex. G at 141-42).  Several days later, Friend issued Plaintiff a corrective counseling for being improperly attired.  (*Id*., Ex. G at 45).

37.   Plaintiff testified that she wore loose-fitting clothing to work and typically wore a jacket.  (Plaintiff Aff. ¶ 31).  Plaintiff's testimony is corroborated by UM Sorrell, who stated that Plaintiff typically dressed in a professional manner.  "She was within standards."  (Wrigley Aff., Ex. M at 8).

38.   Also on August 22, 2007, Friend ordered Plaintiff to attend a "conflict resolution meeting" with the male co-workers about whom she complained.  (Patterson Aff. ¶ 15; *see also id*., Ex. E).  Plaintiff initially refused to go to the meeting.  After Friend informed her she would be fired if she did not attend, Plaintiff attended the meeting.  (Plaintiff Aff. ¶ 34).

39.   Plaintiff alleges that she was belittled and criticized during the meeting.  (*Id.* ¶ 35).

40.   After the meeting, Plaintiff was told that her complaints were "settled."  (*Id.* ¶ 36).

41.   Even after UM Sloss was replaced by UM LeFlore as Plaintiff's supervisor, UM Sloss periodically came into Plaintiff's unit and continued to make inappropriate sexual comments to Plaintiff.  (*Id.* ¶ 23).

### G.     Events Leading Up to Plaintiff's Suspension

42.    Plaintiff alleges that following the events described above, it became increasingly difficult to come to work.  (*Id*. ¶ 37).

43.    Between October 9 and October 13, 2007, Plaintiff arrived late for work, and on four of those five days, she failed to clock out for lunch and exceeded the eight-hour work day without authorization.  (Wrigley Aff. ¶ 14).  On October 13, 2007, in addition to arriving late for work, Plaintiff also failed to work her scheduled full day.  (*Id*; *see also id*., Ex. E).

44.    On October 17 and 18, 2007, Plaintiff arrived late for work and left early, without giving UM LeFlore sufficient time to find a replacement.  (*Id*. ¶ 15).

45.    During the last week of October 2007, Plaintiff was several hours late twice that week, and absent without leave for the remainder of the week.  (*Id*.).

46.    On October 15, 2007, UM LeFlore issued Plaintiff a reprimand for being in a secured area without proper authorization and for being improperly attired in jeans while in the area.  (*Id*. ¶ 16; *see also id*., Ex. D).  Plaintiff entered the facility on a scheduled day-off, failed to clock in, and under the guise of retrieving her insurance card, impermissibly entered a secured area and invited an offender into her office for an interview.  (*Id*. ¶ 16; *see also id.*, Ex. D).  This was a serious breach of security.  (*Id*. ¶ 16).

47.    On October 26, 2007, UM LeFlore requested that Plaintiff be "disciplined, up to and including termination" for "dereliction of duty and chronic and severe

10

absenteeism."  (*Id.* ¶ 15; *id.*, Ex. E).

48.   On November 1, 2007, Plaintiff attended a disciplinary hearing on her October 15, 2007, security violation, as well as her absenteeism and tardiness during October. (*Id.* ¶ 17).  Although Plaintiff refused to sign the disciplinary document, she did "not disagree with the reports on the violation on October 15, 2007." (*Id.* ¶ 17; *see also id.*, Ex. F).  Plaintiff received a one-day suspension.  (*Id.* ¶ 17; *id.*, Ex. F). With respect to her attendance and punctuality infractions, Plaintiff's actions violated GEO's Standards of Conduct pertaining to attendance, under which any pattern of tardiness or absenteeism will be subject to review and disciplinary action.  (*Id.* ¶ 18; *id.*, Ex. G at 439-442).  Plaintiff received a three-day unpaid suspension, and was to be placed on a Work Improvement Plan upon returning to work.  (*Id.* ¶ 18; *id*, Ex. G at 62-63).  Plaintiff refused to sign the disciplinary record.  (*Id.* ¶ 18).

49.   The following day, on November 2, 2007, Plaintiff was improperly attired, and Jennifer French, the Assistant Superintendent of Re-entry ("Assistant Superintendent French"), and UM LeFlore instructed her to leave the facility.  (*Id.* ¶ 19; *id.*, Ex. H).

**H.    The Song**

50.   Following these events, as Plaintiff went to retrieve her keys in her office, an officer began to play a song entitled "Crazy Bitch."  (Plaintiff Aff. ¶ 39).  The lyrics are sexually explicit and crude.  (*Id.*).

11

51.     The following day, as Plaintiff was again retrieving her keys to her office, the
        officer played the song again.  (*Id*. ¶ 40).  Plaintiff reported the events to Officer
        Huddleston (first name unknown) from the Internal Affairs Department.  (*Id*.).  To
        Plaintiff's knowledge, no action was taken.  (*Id*.).

I.      **GEO Learns of More Policy Violations**

52.     While Plaintiff was serving her suspension, on November 15, 2007, GEO's
        mailroom staff noticed that an Arizona offender received mail that indicated he
        had ordered a "gift" to be shipped to another offender.  (*Id*. ¶ 20; *id*., Ex. I).  Upon
        investigation, it was found that Plaintiff processed the Inmate Request for
        Withdraw that allowed one offender to order and pay for a bible for another
        offender.  (*Id*. ¶ 20; *id*., Ex. I).  Plaintiff's actions violated GEO's Inmate Trust
        Fund policy, which allowed offenders to withdraw funds for specified reasons,
        none of which included purchasing an item of value for another offender.  (*Id*. ¶
        20; *id*., Ex. I at 106-110).  When questioned, the offender stated that it was the
        sixth time Plaintiff had helped him process payment for a bible for another inmate.
        (*Id*. ¶ 20; *id*., Ex. I at 449-450).  Assistant Superintendent French requested
        disciplinary action be pursued against Plaintiff.  (*Id*. ¶ 20; *id*., Ex. I at 103).

53.     As noted below, UM LeFlore authorized the withdrawal of funds for the offender.
        (Plaintiff Aff. ¶ 46; Wrigley Aff., Ex. M).  UM LeFlore did not receive discipline
        for this infraction.  (Wrigley Aff., Ex. M).

54.     Telephones inside NCCF are capable of connecting to outside lines without the

12

assistance of a receptionist, who maintains a log of outside calls made from staff inside the facility.  (*Id.* ¶ 21).  The Indiana Department of Correction's telephone policy specifically precludes staff from making any calls for offenders except legal and emergency calls, which require supervisory authorization.  Given that telephone privileges are often abused, Internal Affairs investigators randomly review the phone logs.  (*Id.*).

55.   On November 16, 2007, Friend received an incident report stating that Plaintiff had gone to segregation to speak with an offender who already had a Case Manager.  (*Id.* ¶ 21; *id.*, Ex. J at 451-52).  A review of three days of logs showed that Plaintiff was making numerous calls for offenders in her housing unit.  (*Id.* ¶ 21).  There was no indication of supervisory approval for any of these calls.  (*Id.*).  Assistant Superintendent French immediately requested an investigation into the matter.  (*Id.* ¶ 21; *id.*, Ex. J at 113-15).  UM LeFlore denied reviewing or approving any offender requests for emergency calls.  (*Id.* ¶ 21).

56.   Plaintiff testified that UM LeFlore and other male case managers made personal phone calls in her presence on a daily basis.  (Plaintiff Aff. ¶ 47).  There is no evidence in the record to show that they were disciplined.

57.   On November 20, 2007, a disciplinary hearing was held to discuss Plaintiff's recent policy violations, namely: making unauthorized telephone calls and entering a secured segregation area without prior approval.  (*Id.* ¶ 22; *id.*, Ex. K).  During the hearing, Plaintiff admitted that she was wrong and that the telephone calls she

made were not all legal.  (*Id*. ¶ 22; *id*., Ex. K).  As a result of Plaintiff's actions, she received a five-day unpaid suspension, from December 1 until December 5, 2007.

58.    Also, Plaintiff entered into a Last Chance Agreement, pursuant to which she agreed that a "performance problem of any kind during the period of December 1, 2007 through December 1, 2008 [would] be considered a violation" and cancellation of the Agreement, and lead to termination.  (*Id*. ¶ 22; *id*., Ex. K).

59.    Corporate approval of Plaintiff's suspension took longer than anticipated, and she did not begin her suspension until December 11, 2007.  (*Id*. ¶ 22).

### J.    Plaintiff's EEOC Charge

60.    On the same day as her disciplinary hearing mentioned above, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination, sexual harassment, and retaliation. (Plaintiff's Ex. C).

61.    On December 6, 2007, Jeff Wrigley, Superintendent of NCCF ("Superintendent Wrigley"), received news of Plaintiff's charge of discrimination.  Because Plaintiff named Friend in the charge, the Corporate Office of Professional Responsibility ("OPR") assumed investigation of Plaintiff's allegations.  (*Id*. ¶ 23).

### K.    The OPR's Findings

62.    On December 13, 2007, Superintendent Wrigley sent an email to his supervisors on the outcome of the OPR investigation of Plaintiff's allegations.  (*Id*. ¶ 24; *id*.,

Ex. L).

63.     Superintendent Wrigley noted that the investigation sustained wrong-doing on

Plaintiff's part, but not to the level justifying termination.  (*Id*. ¶ 24; *id*., Ex. L).

Superintendent Wrigley also noted that the investigation confirmed that Plaintiff

had complained twice about sexual harassment to her supervisor, who failed to

report it.  (*Id*. ¶ 24; *id*., Ex. L).  Superintendent Wrigley recommended that

Plaintiff return to work, with back pay.  He decided that he would pursue any

disciplinary action, if any, once the official OPR report was received.  (*Id*. ¶ 24;

*id*., Ex. L).

64.     On January 31, 2008, Superintendent Wrigley received OPR's Investigative

Report.  (*Id*. ¶ 25; *id*., Ex. M).  With respect to Plaintiff, the Report concluded the

following:

a.      Plaintiff was placed in a "hostile/non-conducive work environment" by

having to attend a mandatory "Conflict Resolution" meeting with five

employees against whom she complained.

b.      Friend's position as the investigator of Plaintiff's complaints was

compromised when she facilitated the "Conflict Resolution" meeting.

c.      Contrary to policy, Plaintiff and UM LeFlore, her immediate supervisor, on

three different occasions, authorized an offender to withdraw funds from his

bank account to purchase an item for another offender.  There was

insufficient evidence to determine whether Plaintiff or UM LeFlore

knowingly authorized the withdrawal.

    d.      UM Sorrell failed to report or initiate any actions regarding Plaintiff's initial allegations of sexual harassment against UM Sloss, her first supervisor.

    e.      Gaither (the Human Resources Manager) was remiss in her duties by not insisting that Plaintiff provide her with specific details of her sexual harassment allegations either verbally or in writing.  This failure allowed the situation to deteriorate.

65.    On March 3, 2008, UM Sorrell received a Written Reprimand for his failure to report or act upon Plaintiff's allegations.  (*Id*. ¶ 30; *id*., Ex. N).  This was the "first conduct report of this nature" against UM Sorrell.  (*Id*. ¶ 30).

66.    Friend and Gaither are no longer employed with GEO.  (*Id*. ¶ 31).

**L.    Plaintiff Returns to Work for a Short Time**

67.    Plaintiff returned to work on December 18, 2007.  (*Id*. ¶ 26; *id*., Ex. O).  She was assigned to a new housing unit, the L Unit, and placed under a new Unit Team Leader, Thelma Nornes ("UM Nornes").  (*Id*. ¶ 26).

68.    One of Plaintiff's duties on the L Unit was to release inmates for work release if they were authorized to do so.  (Plaintiff Aff. ¶ 52).  Plaintiff did not receive training for the position, and did not know how to determine if an inmate was authorized to leave on work release.  (*Id*. ¶¶ 51-52).

69.    Plaintiff also did not receive a password for the computer system. (*Id*. ¶ 51).

70.     On December 19, 2007, an inmate approached Plaintiff for authorization to leave for work.  Plaintiff called UM Nornes for help, and, when she did not arrive within the hour, she went to Superintendent Wrigley's office.  (*Id*. ¶ 52).  Because she was so upset, he told her to take the remainder of the day off.  (*Id*.).

71.     The following day, Plaintiff again called UM Nornes for help, but received her voice mail.  Plaintiff went to Superintendent Wrigley's office, but he was not there.  She left and never returned to her position at NCCF.  (*Id*.).

72.     On December 21, 2008, UM Nornes issued Plaintiff a Written Counseling for unauthorized leave time.  (Wrigley Aff. ¶ 27; *id*., Ex. P).  When Plaintiff failed to return to work on December 24, 26, 27, and 28, 2007, UM Nornes requested a disciplinary hearing, which was scheduled for January 7, 2008.  (*Id*. ¶ 28; *id*., Ex. Q).

73.     UM Nornes eventually left a message on Plaintiff's home phone.  (*Id*. ¶ 28).  Plaintiff returned UM Nornes' call and explained that she walked out the morning of December 19, 2007, because she was "such a mess."  (*Id*.).  Plaintiff informed UM Nornes that she had received the notice of the January 7, 2008 disciplinary hearing, and asked whether she would "still have her job" if she attended the hearing.  When UM Nornes informed Plaintiff that she was "in serious jeopardy of losing her job" due to "no calls/no shows" for an extended period of time, Plaintiff responded: "I'm not coming in then.  I already have another job."  (*Id.*).

74.     On January 18, 2008, Superintendent Wrigley sent Plaintiff a letter informing her

that her employment was terminated effective January 7, 2008, for accruing more than 2 consecutive days of unauthorized leave.  (*Id*. ¶ 29; *id*., Ex. R).

## II.    Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party.  *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).  The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial.  *Green v. Whiteco Industries, Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322)).

## III.    Discussion

Plaintiff brings three claims against GEO and IDOC.  They are: (1) hostile work environment sexual harassment; (2) retaliation; and (3) constructive discharge.  The court

18

will begin its discussion with Plaintiff's hostile work environment sexual harassment

claim.  Although Plaintiff's Complaint names both GEO and IDOC as Defendants, and

although both Defendants filed the present motion, the parties address Plaintiff's claims

as being solely against GEO.  Accordingly, the court will proceed as such.

### A.       Sexual Harassment

In order for Plaintiff to prevail on her Title VII hostile work environment sexual

harassment claim, Plaintiff must show: (1) she was subjected to unwelcome harassment;

(2) the conduct was severe or pervasive enough to create a hostile work environment; (3)

the conduct was directed at her because of her sex; and (4) there is a basis for employer

liability.  *Boumehdi v. Plastag Holdings, Inc.*, 489 F.3d 781, 788 (7th Cir. 2007) (citing

*Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007)); *Quantock v. Shared*

*Mktg. Servs., Inc.*, 312 F.3d 899, 903 (7th Cir. 2002) (citing *Hilt-Dyson v. City of*

*Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002).  "In order to establish the 'hostile work

environment' element, the plaintiff must submit evidence showing that she was subjected

to conduct so "'severe or pervasive as to alter the conditions of [her] employment and

create an abusive working environment.'" *Quantock*, 312 F.3d at 903(quoting *Hilt-Dyson*,

282 F.3d at 462-63.  In addition, "a hostile work environment is one that is 'both

objectively and subjectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so.'" *Hilt-Dyson*, 282 F.3d at

463 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)).  In determining

whether the work environment is objectively hostile, the court considers the totality of the

circumstances, including, but not limited to: "the frequency of the discriminatory conduct;

its severity; whether it is psychologically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."

*Quantock*, 312 F.3d at 904 (quoting *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 889

(7th Cir. 2001) (internal quotations omitted); *see also Harris v. Forklift Systems, Inc.* 510

U.S. 17, 23 (1993). This is not an easy task. As the Seventh Circuit Court of Appeals

stated in *Baskerville v. Culligan Int'l Co.*:

> Drawing the line is not always easy. On one side lie sexual assaults; other
> physical contact, whether amorous or hostile, for which there is no consent
> express or implied; uninvited sexual solicitations; intimidating words or
> acts; obscene language or gestures; pornographic pictures. On the other
> side lies the occasional vulgar banter, tinged with sexual innuendo, of
> coarse or boorish workers. We spoke in [*Carr v. Allison Gas Turbine
> Division*] of "the line that separates the merely vulgar and mildly offensive
> from the deeply offensive and sexually harassing." It is not a bright line,
> obviously, this line between a merely unpleasant working environment on
> the one hand and a hostile or deeply repugnant one on the other . . .

50 F.3d 428, 430-431 (7th Cir. 1993) (internal citations omitted).

In conclusion, although this claim is entitled "sexual harassment," the Seventh

Circuit recently held that sexual harassment claims are not limited "to situations in which

the harassment was based on sexual desire." *Boumehdi*, 489 F.3d at 788. Instead, a claim

of sexual harassment may be supported by "comments evincing anti-female animus." *Id*.

With these principles in mind, the court now turns to the merits of Plaintiff's hostile work

environment sexual harassment claim.

20

### 1.    Plaintiff's Working Environment

Plaintiff presented evidence that sexually charged comments were directed towards her virtually from day one of her employment with NCCF.

- On the first day of her job training in March 2007, her supervisor, UM Sorrell, made comments to Plaintiff about her breast size.

- In addition, on that same day, UM Sloss told Plaintiff that he and a male friend would like to have three-way sex with her.

- Following Plaintiff's job training, UM Sloss continued to make inappropriate comments about her breasts on a daily basis, notwithstanding the fact that he was now her immediate supervisor.

- In May 2007, Plaintiff was subjected to sexually graphic questions from UM Sloss and three inmates.

- Following that incident, several IDOC officers made inappropriate requests for sex on two or three occasions.

- Officer Upchurch made Plaintiff wait extended periods at the security gates, while allowing male employees and inmates to go through other security gates.

- In July, UM Sorrell ran his hand in between Plaintiff's legs.

- After reporting this incident to Friend, UM LeFlore, who became her immediate supervisor, took away Plaintiff's inmate clerks, but allowed male case managers to use inmate clerks.

21

- After UM LeFlore became Plaintiff's supervisor, UM Sloss continued to make inappropriate comments to Plaintiff.

- In August 2007, Randall and Friend required Plaintiff to take off her jacket to determine whether her nipples were showing through her top. Following the OPR's investigation, however, UM Sorrell testified that Plaintiff generally dressed professionally and that her tops were not inappropriately tight.

- At the end of August 2007, Plaintiff was forced to attend a meeting with the men she accused of sexually harassing her. The results of the OPR investigation found the meeting to be a "hostile" environment for Plaintiff.

- In November 2007, an IDOC officer played the song "Crazy Bitch" as Plaintiff was retrieving her keys to her office.

- Plaintiff was suspended for conduct that her supervisor, UM LeFlore and other male case managers engaged in, but, unlike Plaintiff, there is no indication in the record that they were suspended or disciplined.

GEO contend the facts of Plaintiff's case are not sufficiently severe or pervasive to establish a claim of hostile work environment. In support of its contention, GEO cites the court to *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (finding no hostile work environment where supervisors and co-workers teased plaintiff about waving at squad cars, made ambiguous sexual comments about bananas, rubber bands, and low-neck tops, stared at her breasts, and, on four occasions, touched her arms, fingers, or

buttocks); *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997) (finding no same-sex harassment where plaintiff's claim was premised on vulgar expressions such as "fuck me" and "kiss my ass," as those comments were not directed at plaintiff because of his gender); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144-45 (7th Cir. 1997) (employee's allegations that manager referred to female customers as "bitchy" or "dumb," appeared to be ogling other female employees, flirted with employee's female relatives, commented on one co-worker's anatomy, told employee he spent the weekend at a nudist camp, and told employee he dreamt of holding her hand, were insufficient to support a hostile work environment claim); *Galloway v. General Motors*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (finding no objective hostile work environment where plaintiff was called a "sick bitch" on numerous occasions and an obscene gesture directed to her while demanding "suck this bitch"); and *Saxton v. Am. Tele. & Telegraph Co.*, 10 F.3d 526, 534-35 (7th Cir. 1993) (finding no hostile work environment where plaintiff alleged two incidents of misconduct by supervisor, one involving the rubbing of plaintiff's upper thigh and a single kiss, and the other involving the supervisor "lurching" at plaintiff from behind).

In virtually all of the cases cited above, the Seventh Circuit noted that the language used by the alleged harassers was not "severe or pervasive" and in some cases, the words themselves were not sufficiently gender-specific.  For example, in *Galloway*, the court stated that the term "bitch" was not a sex- or gender-related term given its use in the context of the case (as opposed to the terms "fucking broads" and "fucking cunts"),

*Galloway*, 78 F.3d at 1168.  The Court also found in *Johnson* that the terms "fuck me,"

"kiss my ass," and "suck my dick," as used in the case, were likewise not gender specific.

*Johnson*, 125 F.3d at 412.  Moreover, in *Adusumilli,* the Court noted that the alleged

harasser's comments amounted to nothing more than "simple teasing, offhand comments,

and isolated incidents."  *Adusumilli*, 164 F.3d at 361; *see also Saxon*, 10 F.3d at 534

(finding that the two incidents relied upon by the plaintiff were not "severe or pervasive

as to create an objectively hostile work environment").

      This case differs from the cases cited by GEO in that many of the comments made

by UM Sloss, UM Sorrell, and by IDOC Officers Yanez and Parker were indeed gender-

specific, and could be interpreted as uninvited sexual propositions.  *See Hostetler v.*

*Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (finding that a co-worker's

reference to oral sex "was more than a casual obscenity" and that it "readily could be

interpreted as an (uninvited) sexual proposition.").  In other words, many of the

comments lodged at Plaintiff were more than "simple teasing, offhand comments, and

isolated incidents."  *See Faragher*, 524 U.S. at 788 ("[S]imple teasing, offhand

comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the terms and conditions of employment.") (internal quotations

and citation omitted).

      In addition, according to Plaintiff, these sexually charged comments and requests

for sex occurred relatively frequently, particularly from UM Sloss, and began literally on

day one of her employment.  Plaintiff testified that UM Sloss made comments to her

nearly every day during the period that he was her immediate supervisor, and continued to make comments during the period that UM LeFlore was her supervisor.  Further, Plaintiff submitted evidence of  anti-female animus, such as Officer Upchurch's refusal to let Plaintiff through the gate while allowing male employees and inmates through, playing the song "Crazy Bitch" in her presence, and disciplining her differently than the other male employees, including UM LeFlore.  Although "[t]here is no 'magic number' of instances required to establish a hostile work environment," *Hostetler*, 218 F.3d at 808 (citing *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445 (7th Cir. 1994)), the court finds that the conduct of Plaintiff's co-workers over the nine-month period of Plaintiff's employment was sufficient to raise a genuine issue of material fact as to whether Plaintiff was subject to a hostile work environment.

### 2.      Employer Liability

### a.      Co-Worker Standard

The court must next determine whether GEO may be liable for the conduct of Unit Team Managers and Officers Yanez and Parker.  As these individuals did not have the ability to hire and fire Plaintiff, or to otherwise directly affect the terms and conditions of Plaintiff's employment, *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002), the court analyzes this claim as co-worker sexual harassment.  In this circumstance, GEO will only be liable if the company was "negligent either in discovering or remedying the harassment."  *Id.* at 356 (7th Cir. 2002) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (internal quotations omitted).  "An employer's legal

duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees." *Id*. (quoting *Parkins*, 163 F.3d at 1032 (internal quotations omitted)).

In the present case, Plaintiff complained to Gaither from Human Resources of the sexual harassment she was experiencing on at least two occasions, and, according to Plaintiff, no action was taken against her alleged harassers.  In July 2007, Plaintiff went to Internal Affairs and spoke with investigator Friend about the situation.  Friend conducted an investigation, but found insufficient evidence that Plaintiff was harassed.        The alleged harassment continued.  Shortly after Plaintiff's meeting with Friend, UM Sorrell ran his hand between Plaintiff's legs as she walked past him.  Plaintiff reported this incident to Friend, but, to Plaintiff's knowledge, no action was taken.  In August 2007, Friend and Randall accused Plaintiff of wearing tops that were too tight, and required Plaintiff to take off her jacket to inspect her chest area.  This occurred three times. Plaintiff was written up for improper attire.  Plaintiff submitted evidence, however, that she did not dress inappropriately.

UM Sloss was replaced by UM LeFlore as Plaintiff's supervisor.  UM Sloss continued to make harassing comments to Plaintiff.

Plaintiff was eventually suspended without pay for conduct that her supervisor, UM LeFlore, likewise engaged in, but for which UM LeFlore did not receive discipline. Moreover, after Plaintiff filed an EEOC charge of discrimination, the OPR conducted its own investigation of Plaintiff's allegations.  After its initial findings were reported to

Superintendent Wrigley, he reinstated Plaintiff with back pay.  OPR's final investigative report found that both Gaither and Friend were remiss in their job duties, and they were eventually fired.  However, the final investigative report did not issue until well after Plaintiff left her position.  The court finds this evidence is sufficient for the court to find a genuine issue of material fact as to whether GEO took reasonable steps to discover and rectify acts of sexual harassment by its employees towards Plaintiff.

Accordingly, the court **DENIES** the Defendants' motion for summary judgment on Plaintiff's hostile work environment sexual harassment claim.

### b.      Strict Liability

Plaintiff alleges that Superintendent Wrigley and his predecessor, Superintendent Hanks, also harassed Plaintiff.  As these men are considered Plaintiff's supervisors within the meaning of Title VII, the employer, GEO, is vicariously liable for their conduct. *Parkins*, 163 F.3d at 1032.

With respect to Superintendent Hanks, Plaintiff alleges that he "ordered" Friend to set up the meeting between Plaintiff and her alleged harassers.  To the extent that this is true, there is no evidence from which the court could otherwise infer that Superintendent Hanks ordered the meeting to harass Plaintiff.  In addition, this is not the type of conduct considered "severe" by the case law, and, given that this was one event in a nine-month period, is not one that could be characterized as "pervasive."

With respect to Superintendent Wrigley, Plaintiff alleges that he harassed Plaintiff by "engaging in conduct which her supervisor, Dan LeFlore, had engaged in and her

27

fellow male case managers." (Plaintiff's Response at 21). The court is not convinced,
given the fact that there was evidence in the record that Plaintiff did in fact violate the
rules.

Lastly, with respect to both allegations, there is no evidence that either
superintendent took action against Plaintiff "because of her sex." Accordingly,
Defendants' motion for summary judgment is **GRANTED** with respect to this issue.

### B.    Retaliation

To prevail on Plaintiff's retaliation claims, Plaintiff must establish that: (1) she
engaged in statutorily protected expression; (2) she suffered an adverse employment
action; and (3) there is a causal link between the protected expression and the adverse
action. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007); *Treadwell v.
Office of Ill. Secretary of State*, 455 F.3d 778, 781 (7th Cir. 2006).

In the present case, Plaintiff complained of sexual harassment multiple times. In
May 2007, she complained twice to Human Resources Manager Gaither, and in July and
in late August 2007, she complained to Internal Affairs Investigator Friend. Plaintiff's
theory of the case is that after she complained to Friend in August 2007, and UM LeFlore
replaced UM Sloss as her supervisor, she began to be treated differently. In support of
her claim, Plaintiff alleges numerous adverse employment actions. These include: (1)
that UM LeFlore took away her inmate clerks in August 2007; (2) that she was subjected
to "nipple checks" by Friend and Randall in August 2007; (3) that she was required to
attend a meeting with Friend and her alleged harassers in August 2007; and (4) that she

28

was suspended without pay in November 2007.

In order to establish an adverse employment action in a Title VII retaliation case, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). This standard differs from that utilized in disparate treatment cases. For example, in 2007, the Seventh Circuit held that a plaintiff's performance warnings issued prior to his termination did not constitute adverse employment actions for purposes of his race and national origin discrimination claims because they did not "affect[] his 'compensation, terms, conditions or privileges of employment.'" *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 847 (7th Cir. 2007) (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court further held, however, that those same performance warnings were sufficient to raise a jury question as to whether they constituted adverse employment actions for purposes of his retaliation claim. *Id*. at 849 (Whether an employment action is adverse "is a context-driven inquiry, and we have declined to rule categorically that warnings cannot be adverse actions.") (internal citation omitted). Given the holding in *Pantoja*, the court finds, in an abundance of caution, that whether the events of August 2007 ((1)UM LeFlore took away her inmate clerks; (2) that she was subjected to "nipple checks" by Friend and Randell; (3) that she was required to attend a meeting with Friend and her alleged harassers) are adverse employment actions is best left for a jury to decide. Plaintiff's suspension without pay in

29

November 2007 is simply too remote in time to be considered.  *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (citing *Longstreet v. Ill. Dep't. of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002)) (holding that a four-month period between the protected activity and the adverse action is insufficient to show a causal connection).

Having found a material issue of fact on the first two elements, the court easily finds a genuine issue on the third element, the causal connection, with respect to the events of August 2007, as they followed very closely after her complaint of sexual harassment to Friend.  Accordingly, the court **DENIES** the Defendants' motion for summary judgment on Plaintiff's retaliation claim.

### C.     Constructive Discharge

To prevail on Plaintiff's constructive discharge claim, Plaintiff must show that "her working conditions were so intolerable that a reasonable person would be compelled to resign."  *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir. 1994).  "Generally, to support such a claim, a plaintiff's working conditions must be even more egregious than the high standard for hostile work environment claims, because, in the ordinary case, an employee is expected to remain employed while seeking redress." *Boumehdi*, 489 F.3d at 789 (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)).

The evidence reflects that after Plaintiff returned to work, she was assigned to a new unit, the L Unit.  Plaintiff was not given any training, was not able to log on to the computer because she was not given a password, and, when she requested help from UM Nornes, she was not available.  Plaintiff testified that at this point, she was depressed and

30

could no longer stand to work at NCCF.  Given the evidence in this case, the court finds, in an abundance of caution, a genuine issue of material fact as to whether a reasonable person would have felt compelled to resign under the circumstances presented to Plaintiff. Accordingly, the court **DENIES** Defendants' motion for summary judgment on Plaintiff's constructive discharge claim.

## IV.    Conclusion

For the reasons set forth above, the court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment (Docket # 42).  Specifically, the court **GRANTS** Defendants' motion with respect to Plaintiff's supervisor hostile work environment sexual harassment claim against Superintendent Wrigley and former Superintendent Hanks, and **DENIES** Defendants' motion with respect to Plaintiff's co-worker hostile work environment sexual harassment claim and Plaintiff's retaliation and constructive discharge claims.


**SO ORDERED** this  25th  day of May 2010.


RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Sylvia Abra Bier
LITTLER MENDELSON, P.C.
sbier@littler.com

Michael A. Moffatt
LITTLER MENDELSON PC
mmoffatt@littler.com

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com